U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed July 19, 2006**                                                                 **United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| JLLCM, INC., | § § § § | CASE NO. 04-83164-BJH-11 |
| Debtor. | § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the First and Final Application for Allowance of Fees and Reimbursement of Expenses of Diane Reed, the Chapter 11 trustee, for the period from November 22, 2005 through May 24, 2006 (the "Trustee Fee Application"); the Application of Lain, Faulkner & Co., P.C. ("Lain Faulkner"), Accountants for the Chapter 11 Trustee, for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the period from December 1, 2005 through April 30, 2006 (the "Lain Faulkner Fee Application"); and  JLLCM, Inc.'s. (the "Debtor") and

Citibank Texas, N.A.'s ("the Bank")[1] objections to the Trustee Fee Application and the Lain Faulkner Fee Application (collectively, the "Fee Applications"). A hearing was held on the Fee Applications ("the Fee Application Hearing") on June 20, 2006. At the conclusion of the Fee Application Hearing, the Court allowed the Trustee and the Debtor to file post-hearing briefs. Upon the filing of the final brief on June 30, 2006, the Court took the Fee Applications under advisement. The Court has core jurisdiction over the Fee Applications pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

I.    **The Trustee Fee Application**

A.    **Factual Background**

The Debtor is a corporation that operates a private daycare and preschool known as the Little Red Wagon School in Crandall, Texas. Because of issues involving delinquent taxes, the Debtor filed for Chapter 11 protection on December 6, 2004 (the "Petition Date"). On March 22, 2005, the Bank moved for relief from the automatic stay (the "Stay Motion"),[2] citing as cause, *inter alia*, a lack of adequate protection because of the Debtor's failure to make regular post-petition payments on three notes held by the Bank.[3] Dkt. 17. At the June 7, 2005 hearing on the Stay Motion, the Court denied the Bank's request to lift the stay. However, the Court did order the Debtor to begin making

---

[1] Citibank Texas, N.A. was formerly known as First American Bank, SSB.

[2] The Bank later filed an amended motion on April, 18, 2005. Docket ("Dkt.") 23. The Court hereby takes judicial notice of its docket in this case. *Sec. & Exch. Comm'n v. First Fin. Group of Tex.*, 645 F.2d 429, 433 n.6 (5th Cir. 1981) (noting that "a court may take judicial notice of its own records").

[3] The original principal amount of the three notes held by the Bank totaled $1,094,247.00. Dkt. 17. The Debtor scheduled the amount of the Bank's secured claim as $960,000.00 as of January 7, 2005. Dkt. 7. The Bank is the only listed secured creditor on Debtor's schedule D. *Id*.

**Memorandum Opinion and Order**                                                                                              **Page 2**

monthly adequate protection payments of $3,000.00 to the Bank. Dkt. 29; Hearing Entry for June 7, 2005.

In the months following the Court's order disposing of the Stay Motion, contentious pleadings were filed by both the Bank and the Debtor against one another, including: (i) the Bank's objection to the Debtor's disclosure statement, (ii) the Debtor's motion to compel the Bank to honor checks being written by the Debtor, (iii) the Bank's motion to prohibit the Debtor's use of cash collateral, (iv) the Debtor's second motion to compel the Bank to honor checks, and (v) the Bank's motion to appoint a trustee in the Debtor's case. All of these pleadings, and the responses thereto, were filed between July 20, 2005 and October 19, 2005.[4]

After hearing the Bank's motion to appoint a trustee, the Court ordered the appointment of a Chapter 11 trustee on October 31, 2005. Dkt. 71. In articulating the rationale behind its decision, the Court made clear that it was not appointing a trustee for any perceived deficiency in the quality of daycare services provided by the Debtor. Rather, the Court found that certain financial anomalies warranted the trustee's appointment, including: (i) inaccuracies in the monthly operating reports filed by the Debtor, (ii) the Debtor's failure to file any monthly operating reports from May 2005 through the hearing on the motion to appoint a trustee, (iii) the unapproved increase in the salary of the Debtor's president, Linda Mayfield ("Mayfield"), and (iv) the Debtor's unauthorized use of cash collateral – *i.e.*, use in excess of the amounts authorized by prior court order. The Office of the United States Trustee appointed Diane Reed as the Chapter 11 trustee of the Debtor (the "Trustee").

---

[4]Without discussing the particulars of each pleading, the Court notes there was significant hostility between representatives of the Bank and Linda Mayfield, the Debtor's president. In short, the parties did not like each other and could not work well together. The level of hostility displayed between the parties was a consideration in the Court's decision to appoint a Chapter 11 trustee, as discussed hereinafter.

**Memorandum Opinion and Order**                                                                                                    **Page 3**

The Trustee and Mayfield first met on November 8, 2005.[5] Mayfield was the officer of the Debtor principally involved in the Debtor's day-to-day business operations. At that time, the Trustee informed Mayfield that, due to her heavy caseload,[6] the Trustee would be unavailable to communicate directly with Mayfield for all practical purposes. The Trustee advised Mayfield that she could continue to run the daycare day-to-day, but that the Trustee would take over the financial operations of the Debtor. The Trustee also advised Mayfield that she should direct all inquiries to the Trustee through the Trustee's paralegal, Marla Bull ("Bull").[7]

While the Court anticipated that the Trustee would allow Mayfield to continue to run the Debtor's day-to-day business operations, the Court also anticipated that the Trustee would provide meaningful assistance to the Debtor, the creditors, and the Court in determining whether the Debtor had a reasonable prospect of successfully reorganizing under Chapter 11.[8] While the Trustee's appointment did insure that financial controls were put in place and provided the Court and creditors with more reliable financial reporting, the Trustee apparently provided no guidance to the Debtor on the formulation of a Chapter 11 plan of reorganization, or input into whether any such plan was potentially viable. In short, the Debtor's management was left to develop a plan of reorganization on its own, working through counsel for the Debtor now out-of-possession. The Debtor out-of-

---

[5]Although the Trustee Fee Application is for the period from November 22, 2005 through May 24, 2006, the Court notes that several time entries in the fee application predate November 22.

[6]The general effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") was October 17, 2005. In the two week period preceding October 17, some 11,000 consumer bankruptcy cases were filed in the Northern District of Texas. These filings created an enormous strain on the system and the Chapter 7 panel trustees. The Trustee serves as a Chapter 7 panel trustee.

[7]The Trustee testified that Bull is a salaried employee of the Trustee.

[8]The Court also hoped that the appointment of a trustee would stop the bickering between the Debtor (Mayfield) and the Bank.

**Memorandum Opinion and Order**                                                                                                              **Page 4**

possession filed its amended disclosure statement and its amended plan of reorganization on December 30, 2005. Dkt. 76, 77.

Moreover, the working relationship between the Trustee and Mayfield quickly soured based on a breakdown of communication. From the testimony provided at the Fee Application Hearing, it is evident that the Trustee was rarely available to Mayfield. Instead, Mayfield was left to communicate with Bull.[9] And, from Mayfield's perspective, problems arose when she could not get answers to her questions without the delay necessitated by Bull having to then communicate with the Trustee before answering Mayfield's questions. This tri-party arrangement resulted in a substantial amount of time being spent by Bull in having to act as a communications intermediary between Mayfield and the Trustee.

Ineffective communication between Mayfield and the Trustee led to several additional problems which threatened to derail this case on its way to a confirmation hearing on the Debtor's plan. First, the insurance on the daycare lapsed for a period of approximately ten days in February of 2006.[10] Second, the Trustee failed to make monthly adequate protection payments to the Bank

---

[9] At the Fee Application Hearing, Mayfield testified to meeting the Trustee in person only three times – *i.e.*, (i) at the initial meeting in November 2005, (ii) when she picked up some checks in February 2006, and (iii) at the Fee Application Hearing.

[10] The insurance on the daycare lapsed for a 10-day period from February 14 through February 24, 2006. The Court notes this incident not as being a failure of the Trustee in carrying out her duties, but as an example of the result of the poor communication between the parties which led to problems. Mayfield wrote a check for the insurance premium shortly before the Trustee was appointed. The Trustee elected to close the account upon which the insurance check had been written and transferred the remaining funds to a new bank. Although the Trustee asked Mayfield to disclose all outstanding checks, and although the Trustee waited for a period of time to allow all outstanding checks to clear before closing the account, the check for the insurance premium was somehow overlooked and it bounced. Because the Trustee was not receiving the Debtor's mail directly (the mail apparently continued to be received at the daycare), the Trustee was unaware of the problem with the insurance premium until notified by Mayfield.

**Memorandum Opinion and Order**                                                                                                              **Page 5**

in accordance with this Court's prior order.[11]  Third, the Trustee left the country for a period of approximately eleven days in March and failed to leave any checks with which to pay the Debtor's vendors in her absence.[12]  Fourth, the Trustee entered into a new cash collateral agreement with the Bank (without advising Mayfield of the agreement) that required the Trustee to sell the daycare, while the Debtor was proceeding forward towards confirmation of its proposed plan.[13]  Finally, the Trustee failed to appear at hearings which directly involved the Trustee in her role as manager of the Debtor's finances.[14]  When questioned about these, and other, incidents at the Fee Application Hearing, the Trustee exhibited a general lack of familiarity with the specifics of the Debtor's business operations.

Notwithstanding these obstacles in the case generally, the Court confirmed the Debtor's plan, as modified to satisfy the remaining Bank objections, on April 25, 2006.  Dkt. 117.  Mayfield and her husband acquired 100% of the equity of the Reorganized Debtor under the Debtor's plan.  The Bank

---

[11]The Trustee testified that she made one adequate protection payment to the Bank.  However, the Trustee testified further that the Debtor had defaulted on the adequate protection payments prior to her appointment.  According to the Trustee, the Bank could have foreclosed upon its collateral under the terms of the Amended Agreed Order Regarding Use of Cash Collateral dated October 21, 2005 because of the Debtor's prior defaults.  Moreover, the Trustee testified that she did not make adequate protection payments because there were insufficient funds in the estate to make up all past due adequate protection payments (which is what the Bank insisted upon according to the Trustee), without putting the estate at risk of becoming administratively insolvent.  According to Mayfield, what this means is that the Trustee wanted to be sure that her fees and expenses could be paid instead of making sure the Bank was paid.

[12]The trip was part of a State Bar of Texas continuing legal education program.  The Trustee testified at the Fee Application Hearing that she could not leave any pre-signed checks with Bull when she left the country, because doing so would have been in contravention of the United States Trustee's guidelines for trustees in this district.

[13]The Trustee testified at the Fee Application Hearing that the Bank understood that the term of the order requiring the sale of the Debtor's property was contingent upon the Debtor failing to successfully confirm its plan of reorganization.  However, as the Debtor noted, this condition is not expressly stated in the order.  *See* Dkt. 112.

[14]For instance, the Trustee did not attend the hearing on the Bank's motion to prohibit use of cash collateral held on March 1, 2006, nor did the Trustee attend the confirmation hearing on the Debtor's plan of reorganization held on April 17 and 20, 2006.  In fact, the Court cannot recall a single hearing that the Trustee attended after her appointment.

consented to confirmation of the Debtor's plan, as modified. Mayfield continues to run the Reorganized Debtor's day-to-day business operations. Mayfield and her husband are responsible for the payment of allowed administrative claims in the case (out of their personal funds) under the terms of the Debtor's confirmed plan.

On May 24, 2006, the Trustee filed the Trustee Fee Application seeking a total of $30,263.28 for compensation of fees and reimbursement of expenses incurred in the case. Dkt. 122. Of this total, $12,980.29 represents the Trustee's compensation.[15] Though not billed at an hourly rate, the Trustee Fee Application reflects a total of 50.3 hours worked by the Trustee on the case. Of these 50.3 hours, at least 15.2 hours of entries on the Trustee Fee Application involve some sort of conference with Bull regarding the case.[16] Because the Trustee "clumped" her time entries, *i.e.*, failed

---

[15]This figure represents the maximum allowable fee for the Trustee's services in accordance with section 326 of the Bankruptcy Code. Section 326(a) provides:

> In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5000 or less, 10 percent on any amount in excess of $5000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a) (2000).
The Trustee made total disbursements, excluding those to the Debtor, in the amount of $194,605.71. Dkt. 122. Accordingly, under the statutory formula of section 326(a), the Trustee is entitled to maximum compensation of $12,980.29, broken down as follows: 25 percent of the first $5000.00 = $1250.00; 10 percent of the next $45,000.00 = $4,500.00; 5 percent of the next $144,605.71 = $7,230.29.

[16]The pertinent time entries in the Trustee Fee Application that reference conferences with Bull include the entries for: November 9, 15, 16, 18, 21, 23, and 30, 2005; December 9, 13, and 29, 2005; January 6, 17, 18, and 20, 2006; February 2, 9, 14, 21, 23, and 24, 2006; March 1, 2, 8, and 9, 2006; and April 4, 6, 10, 18, 21, 25, 26, and 27, 2006. The Trustee's time records of conferences with Bull and Bull's time records of conferences with the Trustee are inconsistent. *See* n. 18, *infra*.

**Memorandum Opinion and Order**                                                                                                  **Page 7**

to itemize the time spent on each task included in each day's time entry,[17] it is impossible to discern what portion of this 15.2 hours was spent in conferencing with Bull and what portion is attributable to the other listed tasks included in each entry.

The remaining $17,282.99 sought in the Trustee Fee Application constitutes the Trustee's billed "expenses" in the case. This "expense" amount includes the time billed for Bull's work on the case. Bull's work totals $15,575.00 of the total expense amount. Bull billed 155.75 hours at $100 per hour for her services as the Trustee's paralegal. Of this 155.75 hours, at least 37.6 hours of time entries involve office conferences/communications with the Trustee regarding matters in the case.[18] Like the Trustee's time entries, these office conferences/communications are clumped with the other tasks performed by Bull on the same day, so it is impossible for the Court to discern how much of the 37.6 hours is actually attributable to office conferences/communications with the Trustee.

Of the remaining $1,707.99 in "expenses," $210.00 are attributable to 4.1 hours billed by Kathryn Eriksen ("Eriksen"),[19] $44.00 are attributable to 1.1 hours billed by Regina Burton

---

[17]According to the Court's Guidelines for Compensation and Expense Reimbursement of Professionals section II(D):

> If a number of separate tasks are performed on a single day, the fee application should disclose the time spent for each such task, i.e., no "grouping" or "clumping." Minor administrative matters may be lumped together where the aggregate time attributed thereto is relatively minor. A rule of reason applies as to how specific and detailed the breakdown needs to be. For grouped entries, the applicant must accept the Court inferences therefrom.

[18]Bull listed time entries referencing conferences/communications with the Trustee on the following days: November 9, 10, 11, 15, 18, and 22, 2005; December 13 and 15, 2005; January 18, 2006; February 9, 14, 21, and 24, 2006; March 1, 2, 8, and 9, 2006; and April 4, 5, 6, 10, and 25, 2006.

[19]While the Trustee does not specify the role Eriksen played in the administration of this case, the Court notes that Eriksen's billable rate is the same as that of Bull, a paralegal. Further, Eriksen's hours appear to show up in the summation of paralegal hours worked on the case. The Court notes that, although Eriksen's time is billed for a total of $410.00 in the body of the Trustee Fee Application, the aggregate of billed paralegal time appearing on the Trustee Fee Application summary page is $15,785.00. This would mean that only $210.00 of Eriksen's time could

**Memorandum Opinion and Order**                                                                                              **Page 8**

("Burton") and Sonya Payne ("Payne") for clerical/secretarial work at $40.00 per hour, and the remaining $1,453.99 is attributable to various other expenses.[20]

As noted previously, the Debtor filed its objection to the Trustee Fee Application on June 13, 2006, arguing, *inter alia*, that (i) the Trustee seeks to recover an amount in excess of the maximum allowable compensation under section 326(a) of the Bankruptcy Code, (ii) the amount sought is unreasonable in relation to the work performed, and (iii) Bull's work on the case is not recoverable as an "expense" of the Trustee. Dkt. 125. The Bank filed its objection to the Trustee Fee Application on June 14, 2006, for the limited purpose of ensuring that the payment of all administrative fees in the case, including those of the Trustee, will be paid out of the cash contributions to be made by Mayfield and her husband under the Debtor's confirmed plan.[21]  Dkt. 128.

**B.    Legal Analysis**

11 U.S.C. § 330 provides:

> (a)(1)   After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—
>
> (A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

---

have been billed, assuming it is paralegal time. The Trustee offers no explanation as to this discrepancy, *e.g.*, was Eriksen's time discounted? Further, the total amount of expenses listed on the Expense Worksheet of the Trustee Fee Application is $17,448.99, which is $166.00 more than the requested expense amount on the Trustee Fee Application summary page. No explanation is offered as to this discrepancy either. Accordingly, the Court will utilize the lower amount of $17,282.99 in its review of the Trustee's expenses.

[20]These expenses include copying charges, telephone charges, postage, etc.

[21]Paragraph 5.7 of the Debtor's plan states that Mayfield and her husband "will contribute new cash into the Debtor, in an amount sufficient to pay the Administrative Claims . . . in exchange for their new shares." Dkt. 115.

**Memorandum Opinion and Order**                                                                                           **Page 9**

>       (B)     reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1)(A-B). The plain language of section 330(a) makes clear that the amount of compensation payable to a trustee for the trustee's services is subject to the statutory cap imposed by the formula of section 326(a). *Cavazos v. Simmons*, 90 B.R. 234, 239 (N.D. Tex. 1988) (Fitzwater, J.).

The crux of the Debtor's argument in objecting to the Trustee Fee Application is that the Trustee cannot seek to recover for Bull's work as a paraprofessional if the aggregate of the Trustee's fee and Bull's fee would exceed the statutory cap imposed by section 326(a).[22] The Debtor relies upon various court decisions that have so held.[23]

While the Debtor correctly cites the holding of those cases, the case law is split on this issue.[24] *See Boldt*, 130 F.3d at 1338 (discussing division in courts addressing issue); *see also In re Abraham*, 163 B.R. 772, 785-89 (Bankr. W.D. Tex. 1994) (same). And, notwithstanding the contrary authority, this Court will follow Judge Fitzwater's decision in *Cavazos*, which specifically addressed this issue

---

[22] The Debtor correctly points out in its objection that the Trustee cannot make a recovery for Bull's work as an expense of the Trustee, which is how the Trustee characterized Bull's work in the Trustee Fee Application. *Cavazos*, 90 B.R. at 239 n. 14 (noting that trustees may not be compensated for paraprofessional services as an expense). However, sustaining such an objection would be elevating form over substance and would result only in the needless duplication of work and wasting of the parties', and the Court's, resources in having to retry the matter. The Court would deny that portion of the Trustee Fee Application without prejudice, only to have the Trustee file another fee application seeking compensation for Bull's work under section 330(a)(1)(A). Therefore, the Court will treat the Trustee Fee Application as seeking compensation for Bull's work as compensation under section 330(a)(1)(A), which is compensable, rather than as an expense under section 330(a)(1)(B), which is not compensable. *See id.* at 240-41.

[23] The Debtor cites the following cases in support of its argument: *Boldt v. Trustee (In re Jenkins)*, 130 F.3d 1335 (9th Cir. 1997); *Clements v. U.S. Bankr. Ct. (In re Asher)*, 171 B.R. 690 (D. Colo. 1994); *In re Balli*, 228 B.R. 546 (Bankr. M.D. Pa. 1998); *In re Santangelo & Co., Inc.*, 156 B.R. 62 (Bankr. D. Colo. 1993); *In re Stewart*, 151 B.R. 255 (Bankr. C.D. Cal. 1993); *In re Hagan*, 145 B.R. 515 (Bankr. E.D. Va. 1992); *In re Berglund Constr. Co.*, 142 B.R. 947 (Bankr. E.D. Wash. 1992); *In re Lanier Spa, Inc.*, 99 B.R. 490 (Bankr. N.D. Ga. 1989); *In re Prairie Cent. Ry. Co.*, 87 B.R. 952 (Bankr. N.D. Ill. 1988).

[24] The Court has not undertaken a specific count of the cases favoring each approach. The Court finds this unnecessary in light of prior case law in this district addressing the issue currently before the Court.

and rejected the argument advanced by the Debtor.[25] *See Rand Energy Co. v. Strata Directional Tech., Inc. (In re Rand Energy Co.)*, 259 B.R. 274, 276 (Bankr. N.D. Tex. 2001) (noting that, "under the federal hierarchical judicial structure," the bankruptcy court is bound by the decisions of the district court in which it sits). Even if this Court is not bound by *Cavazos*, it is persuasive authority. *In re Shattuc Cable Corp.*, 138 B.R. 557, 567 (Bankr. N.D. Ill. 1992) (noting that "[i]n the interests of comity and uniformity . . . bankruptcy courts should give deference to and seek to follow decisions of the district court judges").

In *Cavazos*, the court held that a trustee can be compensated for the work of her paraprofessionals, subject to the standards for compensation set forth in section 330(a)(1),[26] notwithstanding the cap on the trustee's compensation imposed by section 326(a). 90 B.R. at 240-41. Accordingly, the Court holds that the Trustee can seek compensation for the work done by Bull on behalf of the Trustee in administering the estate.

However, both the Trustee's fees and Bull's fees must be reasonable and for necessary services pursuant to section 330(a)(1)(A). *See id*. And, while the Trustee can be compensated up to the statutory cap of section 326(a) for her services, this is a ceiling, not a floor. *Pritchard v. Trustee (In re England)*, 153 F.3d 232, 234-35 (5th Cir. 1998). As such, the Court can award less compensation than that requested by the Trustee. *Id*. at 234. Moreover, section 330(a)(3) gives guidance in determining the amount of reasonable compensation to be awarded the Trustee and Bull

---

[25]While *Cavazos* involved a Chapter 7 trustee, the Court finds this distinguishing fact insignificant.

[26]The Bankruptcy Code was amended in 1994. *Cavazos* cites to section 330(a)(1), which is the pre-1994 equivalent to 11 U.S.C. 330(a)(1)(A). *See Commercial Finish Group, Inc. v. Milbank*, 2003 WL 22038328 at *9 n.1 (N.D. Tex. Aug. 29, 2003) (Lindsay, J.). The pre-amended version of section 330(a)(1) also contained language addressing factors to consider in determining the reasonableness of compensation that is now equivalently reproduced in 11 U.S.C. § 330(a)(3), which is discussed further below.

**Memorandum Opinion and Order** **Page 11**

pursuant to section 330(a)(1)(A):

> (A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> > (A) the time spent on such services;
> > (B) the rates charged for such services;
> > (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> > (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
> > (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). Further guidance is offered in section 330(a)(4), which states:

> (A) Except as provided in subparagraph (B) [not applicable here], the court shall not allow compensation for—
>
> > (i) unnecessary duplication of services; or
> > (ii) services that were not—
> >
> > > (I) reasonably likely to benefit the debtor's estate; or
> > > (II) necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).

In determining what constitutes reasonable compensation for the Trustee's services, the Court has "wide latitude" in exercising its discretion. *Cavazos*, 90 B.R. at 240. While Bull's fee is not subject to any statutory cap, it too is subject to the Court's discretion in determining the reasonableness of the fee charged. *Id*. at 240-41.

The Court finds that the Trustee is not entitled to the statutory maximum compensation allowable under section 326(a) in this case. As noted above, the Trustee communicated with Mayfield in a way that can best be described as inefficient and ineffective. And, the tri-party system

of communication between Bull, the Trustee, and Mayfield resulted in unnecessary duplication of effort and the creation of additional work. At least 15.2 hours of the Trustee's time entries involve conferences between the Trustee and Bull. This is over 30 percent of the Trustee's total time entries. While clearly not all of the 15.2 hours was spent communicating with Bull in response to Mayfield inquiries, the Court cannot determine the actual time spent on such communications because of the Trustee's failure to comply with the Court's guidelines advising against the clumping of time entries. Regardless, the Court finds that the amount of time spent by the Trustee conferring with Bull was unreasonable in the context of this case. It appears that many of the miscommunications in this case could have been avoided, or at least minimized, had the Trustee simply "cut out the middleman" and communicated directly with Mayfield.[27] In addition, the Court is troubled by the Trustee's unfamiliarity with basic facts of the Debtor's operations and the Trustee's absence at significant hearings in the case where her input would have been both appropriate and helpful.[28]

With this said, the Court recognizes that Mayfield contributed to the inefficiencies in the case. Bull's timesheets reflect substantial amounts of time spent in dealing with Mayfield. From the Court's own observations of Mayfield throughout the pendency of this case, Mayfield was highly emotional[29] and clearly struggled with the loss of control associated with a Chapter 11 filing. The

---

[27]The Trustee appears to have been inundated with requests for information from Mayfield. While Mayfield may have required more guidance and attention than the average principal of a debtor, the Court wonders why the Trustee did not "take charge" of the situation by setting up specific times each week (including after normal business hours, if necessary, given the Trustee's panel trustee duties) to meet with Mayfield and address her concerns and questions en masse.

[28]Again, the Court is sympathetic to the Trustee's situation and the demands on her time created by the swell in case filings just prior to BAPCPA's effective date. However, even considering these additional burdens, the Court cannot excuse the Trustee's complete failure to be accessible to Mayfield. If the Trustee's other work load was such that she could not perform fully in this case, she should have declined the appointment.

[29]The Court cannot recall a hearing where Mayfield testified and did not become tearful on the witness stand.

**Memorandum Opinion and Order** **Page 13**

Debtor was her "baby," and she often looked for others to blame for the daycare's immediate problems. From the Court's perspective, the cause of problems are often multi-faceted and, at a minimum, Mayfield played a part in contributing to the operational problems the daycare experienced during the case. Accordingly, when evaluating Mayfield's current complaints against the Trustee, the Court must take its past observations about Mayfield's tendencies to fault others into consideration.

Based upon the Court's review of the totality of the circumstances surrounding the Trustee's performance in this case, the Court will reduce the Trustee's statutory maximum compensation under section 326(a) to a fee of $10,000.00. This amount represents 77 percent of the Trustee's maximum allowable statutory fee and provides reasonable compensation to the Trustee for the services she provided to the estate.[30]

The Court likewise finds that the requested fee for Bull's work on the case is unreasonable. Of the 155.75 hours of work billed by Bull, at least 37.6 hours involve conferences/communications with the Trustee – over 24 percent of Bull's total time. As with the Trustee's time entries, it is obvious that not all 37.6 hours were spent conferring with the Trustee about Mayfield inquiries. And, some conferences with the Trustee, whether about Mayfield inquires or other matters, are appropriate. Because the time entries fail to specify the time spent on each listed task for any given day, the Court is left to guess as to how much of the time was actually attributable to conferences with the Trustee about Mayfield inquiries that could and should have been avoided.

---

[30] The Court arrives at this number by deducting as unreasonable approximately one half of the time included in the Trustee's time entries involving conferences with Bull. The Court extrapolated an hourly rate for the Trustee's time by taking the statutory commission requested and dividing it by the total hours the Trustee spent on the case – i.e., $12,980.29 ÷ 50.3 = $258.10. Then, the Court took one half of the 15.2 hours potentially spent in conferences with Bull, multiplied by $258.10, for a reduction of $1,961.56. The Court further reduced the requested compensation by $1,018.73.

**Memorandum Opinion and Order**

After considering the totality of the circumstances, the Court finds the amount of time spent by Bull in conference with the Trustee unreasonable and unnecessary. Accordingly, the Court will reduce the amount requested for Bull's services by $1,875.00, thereby awarding compensation of $13,700.00 to the Trustee for Bull's paralegal services. This amount represents approximately 88 percent of the time billed by Bull and provides reasonable compensation to the Trustee for the services Bull provided to the estate.[31] The remaining fees[32] and expenses[33] requested by the Trustee will be allowed.

## II. The Lain Faulkner Fee Application

### A. Factual Background

The Trustee filed an application to employ Lain Faulkner as accountants for the Trustee on January 11, 2006 pursuant to section 327(a) of the Bankruptcy Code. Dkt. 79. The Court entered an order granting the application on February 1, 2006. Dkt. 86. After the Debtor confirmed its plan, Lain Faulkner filed the Lain Faulkner Fee Application on May 24, 2006, seeking compensation for fees and reimbursement of expenses in the aggregate amount of $9,957.33.[34] Dkt. 121.

Lain Faulkner provided tax and report preparation services to the Trustee. In support of the

---

[31] The Court arrives at this amount by deducting as unreasonable approximately one half of the time included in Bull's time entries involving conferences/communications with the Trustee.

[32] The remaining fees include $210.00 for Eriksen's services.

[33] The expenses total $1,497.99. This figure includes the $44.00 of clerical time billed by Payne and Burton. Although the issue of whether clerical work is reimbursable as an expense is unsettled, it is within the Court's discretion to award reimbursement for such expenses where proper documentation has been provided. *See Commercial Finish Group*, 2003 WL 22038328 at *9-10.

[34] Lain Faulkner's fees constituted $9,919.50 of the Lain Faulkner Fee Application; expenses totaled the remaining $37.83. Dkt. 121. However, $500.00 of fees were billed in anticipation of the completion of an April 2006 monthly operating report. Per the testimony of D. Keith Enger ("Enger"), the April report was not completed. Accordingly, Enger stipulated to discounting the total fees sought by $500.00. This brings the total amount of fees sought in connection with the Lain Faulker Fee Application to $9,419.50.

**Memorandum Opinion and Order**                                                                                                                      **Page 15**

Lain Faulkner Fee Application, Lain Faulkner provided time sheets which detail a total of 43.5 hours billed for services performed. Of these hours, 29.9 hours were billed by professionals for a total of $6,903.50;[35] the remaining 13.6 hours were billed by staff for a total of $2,516.00.[36] On a project basis, Lain Faulkner billed 22.0 hours for report preparation and 15.3 hours for tax services. Expenses totaled $37.83.

The Debtor filed its objection to the Lain Faulkner Fee Application on June 13, 2006, arguing that the fees sought by Lain Faulkner were unreasonable. Dkt. 126. Specifically, the Debtor objected to Lain Faulkner billing 22.0 hours for the filing of five monthly operating reports (November 2005 through March 2006). The Debtor also objected to the reasonableness of Lain Faulkner billing 15.3 hours for tax issues on the grounds that Lain Faulkner did not adequately resolve these issues, resulting in the Debtor incurring certain tax penalties. *Id*. The Bank filed its objection to the Lain Faulkner Fee Application on June 14, 2006 on the same grounds it objected to the Trustee Fee Application – *i.e.*, the Bank simply wanted to make sure that any fees allowed will be funded by the Mayfields. Dkt. 129.

At the Fee Application Hearing, Enger testified that, in regards to the tax services provided by Lain Faulkner, Enger performed the bulk of the work. Enger also testified that, under normal circumstances, someone at a lower hourly rate would handle such matters. However, because Lain Faulkner was short-handed, Enger ended up doing the work. In all, Enger billed 14.9 hours of time

---

[35]Enger billed the majority of these hours, 19.1, at an hourly rate of $305.00. Additionally, Karen Stephens billed 4.2 hours at an hourly rate of $240.00, and Gene Egan ("Egan") billed .4 hours at an hourly rate of $175.00. The remaining 6.2 hours of time was not billed to the estate. The total value of this non-billed time is $1,767.50 per the hourly rates listed on the Lain Faulkner Fee Application (4.3 hours of Enger's time, 1.9 hours of Stephens' time); however, Lain Faulkner only valued this non-billed time at $1760.50.

[36]Beth Caldwell billed the entirety of the 13.6 hours at an hourly rate of $185.00.

**Memorandum Opinion and Order**                                                                                                   **Page 16**

for completion of the required tax tasks, for a total fee of $4,544.50.[37] While acknowledging the dollar amount as being high, Enger pointed to Lain Faulkner's voluntary fee reduction of approximately $1,700.00 as evidence of its attempt to offset some of the higher costs associated with Enger's work on the case. As to the report preparation services provided by Lain Faulkner, Enger testified that 22.0 hours was a reasonable amount of time to spend preparing five monthly operating reports.

B.   **Legal Analysis**

The Lain Faulkner Fee Application is subject to the same standard of review for reasonableness and necessity of services as is the Trustee Fee Application. 11 U.S.C. § 330(a)(1)(A), (3). Based upon the Court's review of the Lain Faulkner Fee Application, the Court finds that, notwithstanding Lain Faulkner's voluntary fee reduction, the fees charged for the necessary work in this case are not reasonable. While the Court appreciates Lain Faulkner's willingness to cut its own fees, the Court finds that the amount of time billed for filing five relatively simple monthly operating reports is excessive.

Similarly, if the hourly rate for a 40-year tax professional like Egan is $175.00 (who, unfortunately, only billed .4 hours on this case), it is difficult to approve payment of Enger's $305.00 hourly rate for the remainder of Lain Faulkner's tax services without some understanding of why Enger's greater experience and expertise was called for in order to handle the issues presented. If Egan, or some less expensive professional, could have handled all of the tax issues raised here (as it appears on this record), but for some reason those persons were unavailable for this engagement,

---

[37]Egan billed the remaining .4 hours of time for tax services rendered for a total of $70.00. Per the resumes of the Lain Faulkner professionals billing time in the case, attached as Exhibit H to the Lain Faulkner Fee Application, Egan "has over 40 years experience in all areas of tax preparation and general ledger accounting."

**Memorandum Opinion and Order**                                                                                       **Page 17**

Lain Faulkner's staffing problem should not be resolved at the Debtor's expense. Accordingly, the Court will reduce the amount of fees payable to Lain Faulkner on the Lain Faulkner Fee Application to $7,045.68.[38] The expense amount of $37.83 will be paid in full.

## III.    Conclusion

Based upon the Court's review of the Trustee Fee Application, the Lain Faulkner Fee Application, and the objections thereto, it is hereby:

**ORDERED** that the Trustee is awarded $23,910.00 for fees and $1,497.99 for expenses pursuant to the Trustee Fee Application, for a total payment of $25,407.99; and it is further

**ORDERED** that Lain Faulkner is awarded $7,045.68 for fees and $37.83 for expenses pursuant to the Lain Faulkner Fee Application, for a total payment of $7,083.51; and it is further

**ORDERED** that, pursuant to the terms of the Debtor's confirmed plan, Mayfield and her husband shall make a cash contribution to the Reorganized Debtor sufficient to pay these allowed administrative expenses.

**###End of Order###**

---

[38] This figure represents a recalculation of the hours billed for tax services at a $175.00 hourly rate, a two-hour reduction in the amount of time billed for report preparation services, multiplied by the average hourly rate (for report preparation) of $218.41, and the stipulated reduction of $500.00 for the April 2006 monthly operating report that was not completed.